## /UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

ROBERT ERRATO,
    *Plaintiff,*

    v.

AMERICAN EXPRESS COMPANY,
LINKEDIN CORPORATION,
GOOGLE, LLC, and DAVID WHITAKER,
    *Defendants.*

No. 3:18-cv-1634 (VAB)

## RULING AND ORDER ON MOTION TO COMPEL ARBITRATION
## AND STAY ALL PROCEEDINGS

On August 28, 2018, Robert Errato ("Plaintiff"), sued American Express Company

("American Express"), LinkedIn Corporation ("LinkedIn"), Google, LLC ("Google"), and David

Whitaker (collectively "Defendants"), alleging multiple state law causes of action arising from

$600,000 in charges that were placed on his credit card account. Complaint, dated Aug. 28, 2018

("Compl."), annexed as Ex. A to Notice of Removal, dated Sept. 28, 2018, ECF No. 1-1, at 6–23.

On September 28, 2018, American Expressed removed Mr. Errato's action to this Court.

Notice of Removal, dated Sept. 28, 2018, ECF No. 1.

On December 6, 2018, under 9 U.S.C. §§ 3–4, American Express moved for this Court to

compel Mr. Errato to arbitrate his claims against American Express, and to stay all proceedings

in this action pending arbitration. American Express Bank's Motion to Compel Arbitration and

Memorandum of Law in Support ("Arb. Mot."), dated Dec. 6, 2018, ECF No. 38

For reasons explained below, American Express's motion to compel arbitration and stay

all proceedings pending arbitration is **GRANTED**.

# I.     FACTUAL AND PROCEDURAL BACKGROUND

## A.  Factual Allegations

Mr. Errato allegedly is a holder of an American Express Platinum Card "bearing account number ending in 6005." Amended Complaint, dated Nov. 13, 2018 ("Am. Compl."), ECF No. 31, at 2, ¶ 9. In addition, he allegedly holds an American Express Business Gold Card bearing account number ending in 5005, a Business Gold Card ending in 6003, a Platinum Card ending in 7001 and/or 7003, and another Platinum Card ending in 8001." *Id.* at 2–3, ¶¶ 10–13.

Mr. Errato alleges that, beginning in September 2014 and continuing through 2016, more than $600,000 in "unauthorized and/or fraudulent charges" were made to his American Express cards by ISODOC, Inc, d/b/a ISO Developers, or by its principals, agents, or employees. *Id.* at 3, ¶ 15.

Mr. Errato alleges that he properly disputed the charges, "pursuant to the terms of the Cardmember Agreement," and that American Express carried out an investigation. *Id.* at 3, ¶¶ 16–17. The investigation allegedly revealed that "the principal of ISODOC, [Mr. Whitaker], was a convicted felon who was convicted for crimes pertaining to fraud and other crimes involving moral turpitude." *Id.* at 4, ¶ 17(A).

Mr. Errato alleges that "ISODOC and/or Mr. Whitaker charged $41,000 to Google AdWords," and that he had neither personally communicated with Google, or authorized such a charge. *Id.* at 4, ¶ 17(B).

Mr. Errato alleges that when American Express investigated the Google AdWords charge, Google presented it with "documentation stating that [Mr. Errato] was 'Project Manager' of ISO Developers, as well as a LinkedIn profile listing [Mr. Errato] as 'Project Manager of ISO

Developers.'" *Id.* at 4, ¶ 17(C). American Express then allegedly claimed that Google's information substantiated that the charges were authorized. *Id.*

But Mr. Errato alleges that Google's information was false, and that he was not—and is not—affiliated with ISO Developers. *Id.* at 4, ¶ 17(D). He alleges that he "was never employed by it, has never set up a LinkedIn account, and was not aware that any LinkedIn account in his name had ever been created." *Id.*

Mr. Errato alleges that "[h]undreds of [t]housands of [a]dditional unauthorized charges for personal purchases such as clothing, event tickets, gym memberships advertising-services, computers and technology equipment were all fraudulently charged to [his] two American Express accounts by ISODOC, David Whitaker[,] and/or its principals or employees," for which Mr. Errato "never received any product or benefit." *Id.* at 4, ¶ 17(E).

### B. Procedural History

On August 28, 2018, Mr. Errato sued American Express, LinkedIn, Google and Mr. Whitaker in the Superior Court, Judicial District of New Haven, Connecticut, alleging twelve causes of action. Compl.

Mr. Errato alleged that American Express: (1) breached its cardholder agreement with Mr. Errato by holding him responsible for the $600,000 fraudulent charge made to his account by a third entity called ISODOC, *id.* at 3, ¶¶ 9–10; 3–4, ¶ 12; 4, ¶ 14; and 6, ¶ 16; (2) breached its duty of care to Mr. Errato by continuing to honor the fraudulent charges made by ISODOC, *id.* at 6, ¶¶ 16–18; (3) participated in perpetuating fraud against him by continuing to honor the fraudulent charges being placed against the plaintiff's accounts, *id.* at 8, ¶ 19; and (4) committed unfair trade practices under the Connecticut Unfair Trade Practices Act, CONN. GEN. STAT. § 42-110a ("CUTPA")," *id.* at 9, ¶ 16.

Mr. Errato alleged that Mr. Whitaker made the fraudulent charges to Mr. Errato's account in his capacity as a claimed authorized representative of ISODOC and ISO Developers, *id.* at 10, ¶ 17, and that his actions constituted civil theft and/or civil fraud under Connecticut law, *id.* at 12, ¶ 19.

Mr. Errato alleged that Google breached the duty of reasonable care it owed to him and participated in the fraud against him. *Id.* at 13 ¶ 16; 14–15, ¶ 18.

Mr. Errato alleged that LinkedIn breached its duty of care to Mr. Errato by failing "to remove false, fictitious and/or phony profiles on its website" and participated in the fraud against him. *Id.* at 15, ¶ 16; 17, ¶ 18.

Mr. Errato also alleged that Mr. Whitaker, Google, and LinkedIn committed unfair trade practices under CUTPA., *Id.* at 18, ¶ 1.

On September 28, 2018, American Express removed this case from the Superior Court, Judicial District of New Haven, Connecticut, to the United States District Court for the District of Connecticut, under 28 U.S.C. 1446. Notice of Removal, dated Sept. 28, 2018, ECF No. 1. American Express alleged that this Court has jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity between Mr. Errato and Defendants, and because the amount in controversy is greater than $75,000. *Id.* ¶ 2. American Express alleged this District is a proper venue for removal under 28 U.S.C. 1441(a) because it "encompasses Hamden, Connecticut, where this action is now pending." *Id.* ¶ 16.

That same day, Google acknowledged and consented to removal of this case from Connecticut Superior Court to the United States District Court of for the District of Connecticut. *See* Consent to Removal, dated Sept. 28, 2018, ECF No. 3.

On October 1, 2018, LinkedIn Corporation consented to removal of this case from Connecticut Superior Court to the United States District Court for the District of Connecticut. *See* Consent to Removal, dated Oct. 1, 2018, ECF No. 10.

On November 6, 2018, Mr. Whitaker answered Mr. Errato's complaint. Defendant David Whitaker's Answer to Plaintiff's Complaint, dated Nov. 6, 2018, ECF No. 28.

On November 13, 2018, Mr. Errato filed an Amended Complaint. Am. Compl. In addition to his initial allegations, Mr. Errato alleges under Count 1 that at all times he was a holder of the following American Express cards: a Business Gold Card ending in 6003, a Platinum Card ending in 7001 and/or 7003, and another Platinum Card ending in 8001. *Id.* at 3, ¶ 11–13.

On December 3, 2018, Mr. Whitaker answered the Amended Complaint. Defendant Whitaker's Answer to Am. Compl., dated Dec. 3, 2018, ECF No. 37.

On December 6, 2018, American Express moved to compel arbitration under 9 U.S.C. §§ 2 and 4. Arb. Mot. American Express argues that Mr. Errato has agreed to resolving disputes through arbitration, upon assent of the "Cardmember Agreement corresponding to each account" with American Express. *Id.* at 1–2. American Express argues that because both parties are bound by the agreement, and because Mr. Errato's claims are within the scope of the agreement, the Court must compel Mr. Errato to arbitrate his claims against American Express. *Id.* at 4. American Express further argues that the Court should stay all the proceedings in this action, under 9 U.S.C. § 3, pending the outcome of the arbitration. *Id.* at 4–5.

On December 7, 2018, LinkedIn moved to dismiss all of Mr. Errato's claims against LinkedIn. LinkedIn Corporation's Motion to Dismiss, dated Dec. 7, 2018 ("LinkedIn Mot."), ECF No. 39; *see also* LinkedIn Corporation's Memorandum of Law in Support of Motion to

Dismiss, dated Dec. 7, 2018 ("LinkedIn Mot. Mem."), ECF No. 39-1. Specifically, LinkedIn argues that: (1) the Communications Decency Act (DCA), 47 U.S.C. § 230, bars Mr. Errato's claims against LinkedIn, since LinkedIn is an interactive computer service, Mr. Errato's claims against LinkedIn are based on information provided by a third party, and Mr. Errato's claims treat LinkedIn as a publisher, LinkedIn Mot. Mem. at 8–13; (2) that "Mr. Errato failed to plead a plausible negligence claim since he failed to allege a legal duty of care or causation as to LinkedIn," *id.* at 15–16; (3) that Mr. Errato failed to plead his fraud claim with the particularity required under Federal Rule of Civil Procedure 9(b), *id.* at 18; and (4) that Mr. Errato failed to plead a plausible claim under CUTPA, *id.* at 21–23.

Also, on December 7, 2018, Google moved to dismiss all of Mr. Errato's claims against Google. Defendant Google, LLC's Motion to Dismiss, dated Dec. 7, 2018 ("Google Mot."), ECF No. 40; *see also* Memorandum of Law in Support of Google Mot., dated Dec. 7, 2018 ("Google Mot. Mem."), ECF No. 40-1. Google argues that: (1) it owed no duty to Mr. Errato because his alleged harm was unforeseeable, it is not within the public's interest to impose such a duty on Google, and Mr. Errato had no special relationship with Google, Google Mot. Mem. at 5–9; (2) the fraud claim against Google is insufficiently pleaded because it only states allegations as to the first element of a fraud claim, *id.* at 9–10; and (3) since Mr. Errato's CUTPA claims are based on his allegations that Google's actions alleged in counts 8 and 9, and he has failed to sufficiently plead those counts, his CUTPA claim also fails, *id.* at 11.

On December 14, 2018, LinkedIn responded to American Express's motion to compel arbitration. LinkedIn Corporation's Response to Arb. Mot., dated Dec. 14, 2018 ("LinkedIn Arb. Resp."), ECF No. 43. LinkedIn took no position on "the merits of Amex's Motion [to Compel Arbitration]." *Id.* at 1. LinkedIn argued, however, that the Court should rule on its motion to

dismiss before taking up the question of arbitration. *See id.* at 2 ("[I]t would be more efficient for the Court and the parties for the Court to consider LinkedIn's dispositive motion – which could completely resolve the claims against LinkedIn – before the entry of any stay."). LinkedIn argued that it would be "prejudicial to keep [it] in this case – while Errato and Amex arbitrate their issues" when outright dismissal of Mr. Errato's claims against LinkedIn "may be warranted." *Id.*

On December 20, 2018, Google responded to American Express's motion to compel arbitration. Defendant Google, LLC's Response to Arb. Mot., dated Dec. 20, 2018 ("Google Arb. Resp."), ECF No. 47. Google did not object to the request for arbitration, but notes that "the motion [to Compel Arbitration] does not seek to have [Mr.] Errato's claims against Google included within the arbitration, not could it, and Google does not consent to the arbitration of those claims." *Id.* at 1–2. In addition, Google joined American Express's request to stay this action pending the outcome of the requested arbitration, arguing that "the Court should allow the primary dispute to resolve in arbitration before determining whether there are any claims left to proceed." *Id.*

On December 21, 2018, American Express replied to LinkedIn's response to its motion to compel arbitration. American Express Bank's Reply to Linked Arb. Resp., dated Dec. 21, 2018, ECF No. 49. American Express argued that the Court should not delay its ruling on American Express's Motion to Compel Arbitration on the basis of LinkedIn's request. *Id.* at 1. American Express argues that there is no reason for LinkedIn's motion to be ruled on first, as opposed to American Express's motion, but notes that the decision whether to do so is entirely within this Court's discretion. *Id.* at 1.

On December 27, 2018, Mr. Whitaker responded to American Express's Motion to Compel Arbitration. Defendant David Whitaker's Response to American Express's Motion to Compel Arbitration, dated Dec. 27, 2018 ("Whitaker Arb. Resp."), ECF No. 50. Like Google, Mr. Whitaker has no objections to the request to compel arbitration, but notes that he is neither requesting nor consents to any claims against him being moved into arbitration. *Id.* at 1. Mr. Whitaker also joined the request to stay the action "pending the outcome of the requested arbitration." *Id.*

On January 11, 2019, American Express replied to Mr. Whitaker's response to the motion to compel arbitration, affirming that it is "not moving to compel arbitration of any of [Mr. Errato's] claims against. [Mr. Whitaker]." American Express National Bank's Reply to Whitaker Arb. Resp., dated Jan. 11, 2019, ECF No. 51.

On January 11, 2019, Mr. Errato opposed the Google and LinkedIn motions to dismiss. Plaintiff's Response and Objection to Google Mot., dated Dec. 11, 2019 ("Pl.'s Google Opp."), ECF No. 52; Memorandum of Law in Support of Pl.'s Google Opp., dated Jan. 11, 2019, ECF No. 53; Plaintiff's Response and Objection to LinkedIn Mot., dated Jan. 11, 2018 ("Pl.'s LinkedIn Opp."), ECF No. 54; Memorandum of Law in Support of Pl.'s LinkedIn Opp., dated Jan. 11, 2019, ECF No. 55.

That same day, Mr. Errato also opposed American Express's motion to compel arbitration. Plaintiff's Response and Objection to Arb. Mot., dated Jan. 11, 2018 ("Pl.'s Arb. Opp."), ECF No. 56; Memorandum of Law in Support of Pl.'s Arb. Opp., dated Jan. 11, 2018 ("Pl.'s Arb. Mem."), ECF No. 57. Mr. Errato argues that "the arbitration provisions alleged by Amex only pertain to two of the five charge cards alleged in the complaint" and that compelling arbitration would still leave claims based on the other three cards in this Court, unnecessarily

bifurcating the dispute "between this [C]ourt and arbitration," Pl.'s Arb. Mem. at 4. Mr. Errato

also argues that the arbitration provisions of the cardholder agreement are not enforceable

because he does not recall any such provisions and does not recall receiving any particular

amendment to his Cardmember Agreement containing them. *Id.*; *see* Affidavit of Robert Errato

in Support of Pl.'s Arb. Opp., dated Jan. 11, 2019 ("Errato Aff."), ECF No. 57-1.

On January 25, 2019, both LinkedIn and Google replied to Mr. Errato's opposition to

their motions to dismiss. Reply in Support of LinkedIn Mot., dated Jan. 25, 2019, ECF No. 60;

Reply in Support of Google Mot., dated Jan. 25, 2019, ECF No. 61.

On February 13, 2019, American Express replied to Mr. Errato's response to its motion

to compel arbitration. American Express National Bank's Reply to Pl.'s Arb. Opp., dated Feb.

13, 2019 ("Arb. Mot. Reply"), ECF No. 62. Specifically, American Express argues that all of

Mr. Errato's claims fall within the scope of the arbitration clauses of the cardholder agreement

between American Express and Mr. Errato because (1) while Mr. Errato had five card numbers

over the course of his relationship with American Express, he only had two accounts, *id.* at 2;

and (2) Mr. Errato's admission of being bound and the use of his American Express card

constitute his assent to the arbitration clauses, *id.* at 3.

On July 25, 2019, the Court held oral argument on American Express's motion to

compel arbitration and reserved decision. Minute Entry, dated Jul. 25, 2019, ECF No. 67.

## II.     STANDARD OF REVIEW

The Federal Arbitration Act ("FAA") "establishes a national policy favoring arbitration

when the parties contract for that mode of dispute resolution." *Preston v. Ferrer,* 552 U.S. 346,

349 (2008). Section 2 of the FAA provides that "[a] written provision in ... a contract evidencing

a transaction involving commerce to settle by arbitration a controversy thereafter arising out of

such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 4 of the FAA enables any "party aggrieved" by the failure of another to arbitrate under a written agreement for arbitration to petition a United States District Court "for an order directing that such arbitration shall proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

Courts follow a two-part test to determine whether claims are subject to arbitration, considering "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Express Fin. Advisors Sec. Litig.,* 672 F.3d 113, 128 (2d Cir. 2011). "A court may not deny arbitration where there is a valid arbitration agreement that covers the asserted claims." *Davis v. Macy's Retail Holdings, Inc.,* No. 3:17-cv-1807 (JBA), 2018 WL 4516668, at *2 (D. Conn. Oct. 22, 2018) (citation omitted).

In the context of a motion to compel arbitration brought under the FAA, courts apply "a standard similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat,* 316 F.3d 171, 175 (2d Cir. 2003); *see also McAllister v. Conn. Renaissance Inc.,* No. 3:10-cv-1488 (WWE), 2011 WL 1299830, at *3 (D. Conn. Apr. 5, 2011) (applying summary judgment standard in the context of a motion to compel arbitration). The party seeking to compel arbitration must "substantiate [its] entitlement [to arbitration] by a showing of evidentiary facts" that support its claim that the other party agreed to arbitration. *Oppenheimer & Co., Inc. v. Neidhardt,* 56 F.3d 352, 358 (2d Cir. 1995). "If the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." *Id.* If the

evidence suggests a genuine issue of material fact, the court must summarily proceed to trial. *Bensadoun,* 316 F.3d at 175 (citing 9 U.S.C. § 4).

The court, "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ." 9 U.S.C. § 3; *Nicosia v. Amazon.com, Inc.,* 834 F.3d 220, 229 (2d Cir. 2016) ("The district court must stay proceedings once it is 'satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding.'") (quoting *WorldCrisa Corp. v. Armstrong,* 129 F.3d 71, 74 (2d Cir. 1997)).

## III.     DISCUSSION

American Express argues that it entered into multiple valid agreements to arbitrate with Mr. Errato, and that Mr. Errato's claims against them squarely fall within the scope of that agreement. Because there is no genuine dispute of material fact as to either of these issues, the Court agrees.

### A.  Validity of Agreement to Arbitrate

"The threshold question facing any court considering a motion to compel arbitration" is "whether the parties have indeed agreed to arbitrate." *Schnabel v. Trilegiant Corp.,* 697 F.3d 110, 118 (2d Cir. 2012). That question "is determined by state contract law principles." *Nicosia,* 834 F.3d at 229 (citing *Specht v. Netscape Commc'ns Corp.,* 306 F.3d 17, 27 (2d Cir. 2002)); *see First Options of Chi. v. Kaplan,* 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally ... should apply ordinary state-law principles that govern the formation of contracts.") (citations omitted).

American Express initially submitted a declaration from a record custodian and two amendments to its Cardmember Agreements in support of its motion to compel. *See* Declaration of Keith Herr, dated Dec. 3, 2018 ("Herr Decl."), annexed as Ex. A to Arb. Mot., ECF No. 38-1; Cardmember Agreement, dated Dec. 31, 2010 ("Dec. 31, 2010 Amdt."), annexed as Ex. 1 to Herr Decl. (amended cardmember agreement for Platinum Card® issued by American Express Centurion Bank to Cardmember Robert Errato for Account Ending in 6005); Cardmember Agreement, dated Jun. 27, 2011 ("Jun. 27, 2011 Amdt."), annexed as Ex. 2 to Herr Decl. (amended cardmember agreement for Business Gold Card issued by American Express Bank, FSB to Cardmember Robert Errato for Account Ending in 5005).

Because Mr. Errato subsequently challenged the application of these agreements to all of his cards, American Express submitted an additional declaration from another records custodian describing how the particular American Express accounts held by Mr. Errato were linked to different card numbers over time, as well as two additional amendments, with its reply. Declaration of Raquel Hernandez, dated Feb. 12, 2019 ("Hernandez Decl."), annexed to Arb. Mot. Reply, ECF No. 62-1; Cardmember Agreement: Part 2 of 2, dated Jun. 30, 2015 ("Jun. 30, 2015 Amdt."), annexed as Ex. 1 to Hernandez Decl. (Part 2 of amended cardmember agreement for Business Green Rewards Card issued by American Express Bank, FSB to Cardmember Robert Errato for Account Ending in 6003; Cardmember Agreement: Part 2, dated Nov. 2, 2018 ("Nov. 2, 2018 Amdt."), annexed as Ex. 2 to Hernandez Decl. (Part 2 of amended cardmember agreement for Platinum Card® issued by American Express Bank, FSB to Cardmember Robert Errato for Account Ending in 8001).

Accordingly, the Court analyzes all four alleged amendments to determine whether a valid agreement to arbitrate exists.

### 1. Choice of Law

As an initial matter, all of the putative amendments include choice-of-law provisions stating that "Utah law and federal law govern this Agreement and the Account." Dec. 31, 2010 Amdt. at 7, "Governing Law" ; Jun. 27, 2011 Amdt. at 8, "Governing Law"; Jun. 30, 2015 Amdt. at 5, "Governing Law"; Nov. 2, 2018 Amdt. at 5, "Governing Law." [1]

Generally speaking, choice-of-law clauses have been applied to determine which state's law governs the validity of an arbitration agreement. *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 50 (2d Cir. 2004) ("We have applied a choice-of-law clause to determine which laws govern the validity of an agreement to arbitrate . . . . More generally, a choice-of-law clause in a contract will apply to disputes about the existence or validity of that contract.") (citing *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 32 n.3 (2d Cir. 2001); *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996). The choice-of-law clause here therefore would require this Court to apply Utah contract law in determining whether there is a valid agreement to arbitrate here.

But the Second Circuit has also recognized that "[a]pplying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established." *Schnabel*, 697 F.3d at 119.

The Second Circuit's decision in *Motorola*, which "rested on the assumption that 'the parties have chosen the governing body of law,'" is "less applicable" where a party "challenges the enforceability of the agreement in its entirety." *Laterra v. GE Betz*, No. 3:17-cv-57 (VAB), 2017 WL 3485505, at *5 (D. Conn. Aug. 14, 2017). In other words, *Motorola* recognized that

---

[1] American Express does not squarely address the choice-of-law issue in its motion, simply arguing that general state contract law principles are used to determine validity. *See* Arb. Mot. at 3–4. Mr. Errato applies no state law at all. *See* Pl.'s Arb. Mem. at 3–5. In its reply brief, American Express cites to Connecticut, New York, and federal caselaw in addressing validity. *See* Arb. Mot. Reply.

defendants wishing to invoke the arbitration clauses of their contracts must also accept the choice-of-law clauses that govern those agreements. *See Motorola*, 388 F.3d at 50– 51 ("[W]here the parties have chosen the governing body of law, honoring their choice is necessary to ensure uniform interpretation and enforcement of that agreement and to avoid forum shopping . . . . In short, if defendants wish to invoke the arbitration clauses in the agreements at issue, they must also accept the Swiss choice-of-law clauses that govern those agreements.").

In the absence of a choice-of-law agreement, federal courts sitting in diversity jurisdiction "must apply the choice of law rules of the state in which the action was brought." *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 46 n.6 (2d Cir. 1993) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Accordingly, the Court generally would apply Connecticut choice of law rules to determine which state's law to apply here.

The Connecticut Supreme Court has adopted the "most significant relationship" approach to analyze choice of law issues involving contracts. *Am. States Ins. Co. v. Allstate Ins. Co.*, 282 Conn. 454, 461 (2007); *see Interface Flooring Sys., Inc. v. Aetna Cas. and Sur. Co.*, 261 Conn. 601, 608–09 (2002) ("The starting point under the 'most significant relationship' approach is § 188 of the Restatement (Second) of the Conflict of Laws, which provides in relevant part: '(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.') (citation omitted). Under this approach, Connecticut law likely would apply, given that there are no allegations that Mr. Errato has lived anywhere else during the course of his contractual relationship with American Express.

Because there appears to be no significant substantive difference between Utah and Connecticut law with respect to their treatment of mutual assent to a contract, the Court ultimately need not reach the issue of which state's law to apply. *See Schnabel*, 697 F.3d at 119 ("[A]s the district court recognized, neither that court nor this one need resolve this typically thorny choice-of-law question, because both Connecticut and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term. Which state's law applies is therefore without significance.") (citation omitted).

### 2. Mutual Assent Requirement

Under both Connecticut and Utah law, a contract is formed through an offer and an acceptance of that offer. *See Bridgeport Pipe Eng'g Co. v. DeMatteo Constr. Co.,* 159 Conn. 242, 246 (1970) ("It is elementary that to create a contract there must be an unequivocal acceptance of an offer . . . . The acceptance of the offer must, however, be explicit, full and unconditional.") (citations omitted); *Ubysz v. DiPietro,* 185 Conn. 47, 51 (1981) ("[I]n order to form a contract, generally there must be a bargain in which there is a manifestation of mutual assent to the exchange between two or more parties; and the identities of the contracting parties must be reasonably certain.") (internal citations omitted); *Cal Wadsworth Constr. v. City of St. George*, 898 P.2d 1372, 1376 (Utah 1995) ("An acceptance is a manifestation of assent to an offer, such that an objective, reasonable person is justified in understanding that a fully enforceable contract has been made . . . . An acceptance must unconditionally assent to all material terms presented in the offer, including price and method of performance, or it is a rejection of the offer."); *John Call Eng'g v. Manti City Corp.*, 743 P.2d 1205, 1207 (Utah 1987) ("[I]t is a basic principle of contract law that there can be no contract without the mutual assent of the parties.").

These principles apply with equal force to contract modifications. *See Herbert S. Newman & Partners, P.C. v. CFC Const. Ltd. P'ship*, 236 Conn. 750, 761–62 (1996) ("For a valid modification to exist, there must be mutual assent to the meaning and conditions of the modification and the parties must assent to the same thing in the same sense.") (collecting cases) (internal quotation marks omitted); *Joseph Gen. Contracting, Inc. v. Couto*, 317 Conn. 565, 578 (2015) ("A modification to an existing contract can only be brought about by agreement of the parties to the contract to be modified.") (citing *Ass'n Res., Inc. v. Wall*, 298 Conn. 145, 189 (2010) ("[p]arties may alter any term of an existing contract . . . [t]he contract as modified becomes a new contract between the parties.")); *Richard Barton Enters. v. Tsern*, 928 P.2d 368, 373 (Utah 1996) ("A valid modification of a contract or lease requires "a meeting of the minds of the parties, which must be spelled out, either expressly or impliedly, with sufficient definiteness."); *Rapp v. Mountain States Tel. & Tel. Co.*, 606 P.2d 1189, 1191 (Utah 1980) ("It is well-settled law that the parties to a contract may, by mutual consent, alter all or any portion of that contract by agreeing upon a modification thereof. Where such a modification is agreed upon, the terms thereof govern the rights and obligations of the parties under the contract, and any pre-modification contractual rights which conflict with the terms of the contract as modified must be deemed waived or excused.") (footnotes collecting cases omitted).

Under both Connecticut and Utah law, the party attempting to establish the existence of an enforceable contract—including a contract modification—bears the burden of proving mutual assent to establish that its claimed version of the contract exists. *See Bridgeport Pipe*, 159 Conn. at 246 ("[T]he burden rested on the plaintiff to prove a meeting of the minds to establish its version of the claimed contract."); *LeBlanc v. New Engl. Raceway, LLC*, 116 Conn. App. 267, 271 (2009) ("It is well settled that the party seeking to establish the existence of an enforceable

contract bears the burden of proving a meeting of the minds between the parties.") (citation omitted); *Bybee v. Abdulla*, 2008 UT 35, ¶ 8 ("[T]he burden of proof for showing the parties' mutual assent as to all material terms and conditions is on the party claiming that there is a contract. Arbitration agreements are not exempt from this rule.") (quoting *Cal Wadsworth* 898 P.2d at 1376)); *Mardesich v. Sun Hill Homes*, 2017 UT App 33, ¶ 15 ("The party claiming that there has been a modification to a contract . . . carries the burden of proof for showing the parties' mutual assent to the modification.") (quoting *Westmont Residential LLC v. Buttars*, 2014 UT App 291, ¶ 15).

### 3. Receipt of Amendments to Cardmember Agreements

To satisfy its burden as the party seeking to enforce the contract modification, American Express has submitted evidence of multiple alleged amendments to its Cardmember Agreements.[2] The earliest of these amendments, dated December 31, 2010, has a lengthy section providing for arbitration that includes the following language:

> [T]he term *claim* means any claim, dispute, or controversy between you and us arising from or relating to your Account, this Agreement, the Electronic Funds Transfer Services Agreement, and any other related or prior agreement that you may have had with us, or the relationships resulting from any of the above *agreements*, except for the validity, enforceability or scope of this Arbitration provision . . . . *Claim* includes claims of every kind and nature, including but not limited to, initial claims, counterclaims, cross-claims, and third-party claims and claims based upon contract, tort, fraud and other intentional torts, statutes, regulations, common law and equity . . . . The term claim is to be given the broadest possible meaning that will be enforced . . . .
>
> Any claim shall be resolved, upon the election by you or us, by arbitration pursuant to this Arbitration provision and the code of procedures of the arbitration organization to which the claim is

---

[2] Although the original Cardmember Agreements are not in the record, neither party disputes that, when Mr. Errato first opened his American Express accounts in 1987, he agreed to the terms and conditions of American Express's Cardmember Agreements.

referred in effect at the time the claim is filed (*code*), except to the extent the code conflicts with this Agreement. Claims shall be referred to either JAMS or the American Arbitration Association (*AAA*), as selected by the party electing to use arbitration . . . .

IF ARBITRATION IS CHOSEN BY ANY PARTY WITH RESPECT TO A CLAIM, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OR HAVE A JURY TRIAL ON THAT CLAIM. FURTHER, YOU AND WE WILL NOT HAVE THE RIGHT TO PARTICIPATE IN A REPRESENTATIVE CAPACITY OR AS A MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION. EXCEPT AS SET FORTH BELOW, THE ARBITRATOR'S DECISION WILL BE FINAL AND BINDING. NOTE THAT OTHER RIGHTS THAT YOU OR WE WOULD HAVE IF YOU WENT TO COURT ALSO MAY NOT BE AVAILABLE IN ARBITRATION . . . .

IF EITHER PARTY ELECTS TO RESOLVE A CLAIM BY ARBITRATION, THAT CLAIM SHALL BE ARBITRATED ON AN INDIVIDUAL BASIS . . . .

Dec. 31, 2010 Amdt. at 7–8, "Arbitration." Substantially similar[3] arbitration provisions can be found in the amendments to the Cardmember Agreements dated June 27, 2011, June 30, 2015 and November 2, 2018.[4] *See* Jun. 27, 2011 Amdt. at 8–9, "Arbitration"; Jun. 30, 2015 Amdt. at 5–8, "Claims Resolution"; Nov. 2, 2018 Amdt. at 5–8, "Claims Resolution."

American Express argues that all of these amendments—all of which list, on the first page, Mr. Errato's name and the ending digits of the card number to which the amendment

---

[3] While some of the particular wording of the language did change, the nature of those changes goes to scope, not validity, and is therefore addressed below. *See infra* § III.B.

[4] So many amendments were submitted because, in response to the motion to compel, Mr. Errato's counsel suggested that the first amendments American Express submitted only related to two specific card numbers. In response, American Express submitted further amendments and an affidavit from a record custodian explaining that, while Mr. Errato's card numbers have changed several times, these changes were made only for security or other reasons. In other words, American Express argues that Mr. Errato has maintained the same two card accounts for the entire time he has been a customer. Mr. Errato has not introduced anything to suggest that there is a genuine dispute of material fact as to this issue.

applies—were all mailed to Mr. Errato and notified him of changes to his account terms. *See* Herr Decl. ¶ 5; Hernandez Decl. ¶ 14.

In addition, American Express has submitted two notices, titled "Important Changes to Your Account Terms," which specifically detailed upcoming changes to the Cardmember Agreements that were to become effective January 1, 2013. *See* Exs. 3 & 4 to Arb. Mot. Both of these notices explain changes to the arbitration provision and state that cardmembers have the opportunity to reject the provision. *See id.* at "Changes to the Arbitration Provision." American Express alleges that these notices were mailed to Mr. Errato, along with his bill, in October 2012, but that Mr. Errato did not opt out. *See* Herr Decl. ¶ 7 ("Plaintiff did not opt out of the Arbitration Provisions for the Accounts. I can determine this because it was American Express's standard business practice to include a note in the computerized account records of those cardmembers who chose to opt out. The records for the Accounts do not reflect any such note, and there is no indication in the account records for the Accounts that Plaintiff ever notified American Express of his refusal to accept the terms of the Arbitration Provisions.").

Mr. Errato has not directly disputed that these amendments to the Cardmember Agreements, dated December 31, 2010 and June 27, 2011, were sent to him. Nor has he directly disputed that any of the amendments were mailed to him, or that the notices of the 2013 changes were mailed to him. In an affidavit, he instead has claimed to have no recollection of "any Arbitration Provision contained in [his] Cardmember Agreement" nor "any recollection of receiving any particular amendment to [his] Cardmember Agreement which imposed an Arbitration provision, or which required [him] to 'opt out' of an Arbitration participation." *See* Errato Aff. ¶¶ 3–4. He further claimed that he has "received monthly correspondence from

AMEX for probably 30 years or more, and do[es] not recall ever having been alerted that any change to [his] Cardmember Agreement would negate [his] right to a trial by jury[.]"[5] *Id.* ¶ 5.

Denying receipt of a contract modification containing an arbitration clause may be sufficient—at least under Connecticut law—to raise an issue of fact requiring the court to proceed summarily to trial of that issue. *See, e.g.*, *Capone v. Electric Boat Corp.*, No. 3:06-cv-1249 (JCH), 2006 WL 3741116, at *4 (D. Conn. Dec. 19, 2006) ("The trend in the Connecticut trial courts appears to be that an addressee's denial of receipt raises an issue of fact for the jury. Based on this trend, the court finds that, by his denial of receipt, Capone has raised an issue of fact as to whether he had notice of DRP's terms. Therefore, Electric Boat's Motions to Compel Arbitration (Doc. No. 12) and to Stay (Doc. No. 14) are DENIED.") (collecting cases)).[6]

But Mr. Errato has not expressly denied receipt of these amendments, and whether Mr. Errato subjectively remembers the provisions in question is not relevant as a matter of

---

[5] At oral argument, Mr. Errato's counsel argued that the Court could not accept the agreements in question as valid absent some kind of proof that they were actually received. He argued that the Court should view these modifications as Connecticut law views insurance policy modifications —i.e., that American Express should be required to demonstrate proof of notice, either by use of certified mail or some other mechanism. "This Court need not consider an argument raised for the first time at oral argument." *Harris v. Wu-Tang Prods., Inc.*, No. 05 Civ. 3157 (WHP), 2006 WL 1677127, at *3 (S.D.N.Y. Jun. 16, 2006) (collecting cases); *see Bd. of Mgrs. of Mason Fisk Condo. v. 72 Berry St., LLC*, 801 F. Supp. 2d 30, 39 (E.D.N.Y. 2011) ("Arguments raised for the first time at oral argument are generally deemed waived.") (citing *Tamar v. Mind C.T.I., Ltd.*, 723 F. Supp. 2d 546, 555 (S.D.N.Y. 2010)); *see also United States v. Barnes*, 158 F.3d 662, 672 (2d Cir. 1998) ("Normally, we will not consider arguments raised for the first time in a reply brief, let alone [at or] after oral argument.") (declining to apply this rule where argument was "understandably overlooked" as it appeared only in the footnote of an appellate brief). But even if the Court were to consider this argument, the Court would not adopt it, as counsel has identified no applicable Connecticut or Utah law that would modify the general burden of proof American Express must meet (and has met) here.

[6] After a bench trial, the court in *Capone* ultimately determined that the agreement had, in fact, been received. *See also Capone v. Electric Boat Corp.*, No. 3:06-cv-1249 (JCH), 2007 WL 1520112, at *2–3 (D. Conn. May 18, 2007) ("Having denied Electric Boat's motions, the court determined, at a February 26, 2007 telephone conference with the parties, (Doc. No. 29), that Capone was entitled to a trial on the issue of arbitrability, pursuant to Section 4 of the FAA. The court subsequently held a bench trial on April 27, 2007, to decide the factual issues of whether and when Capone had notice of the DRP's terms (Doc. No. 49) . . . . The court concludes that, before filing this lawsuit, Capone received notice of the DRP. In so concluding, the court relies on its findings that Capone received three Electric Boat's mailings to his home containing the DRP and that Electric Boat specifically informed Capone that the DRP required him to forego a judicial forum via a August 31, 2004 letter from an Electric Boat employee. ") (footnote omitted).

Connecticut and Utah contract law. What matters is whether Mr. Errato received the amendments and accepted their terms. *See Griffin v. Nationwide Moving & Storage Co., Inc.*, 187 Conn. 405, 414 (1982) ("In other words, the existence of a binding contract limiting the defendant's liability, as claimed, is not dependent upon the subjective intent of the parties.") (citations omitted); *Jaramillo v. Farmers Ins. Grp.*, 669 P.2d 1231, 1233 (Utah 1983) ("It is well established in the law that unexpressed intentions do not affect the validity of a contract . . . . 'The apparent mutual assent of the parties, essential to the formation of a contract, must be gathered by the language employed by them, and the law imputes to a person an intention corresponding to the reasonable meaning of its words and acts. It judges of his intentions by his outward expressions and excludes all questions in regard to his unexpressed intention. If his words or acts judged by reasonable standard manifests an intention to agree to the matter in question, the agreement is established and it is immaterial what may be the real but unexpressed state of his mind upon the subject.'") (quoting *Allen v. Bissinger & Co.*, 62 Utah 226 (1923)); *see generally Hotchkiss v. Nat'l City Bank of N.Y.*, 200 F. 287, 293 (S.D.N.Y. 1911) (Hand, J.) ("A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent."), *aff'd sub nom.*, *Ernst v. Mechs.' & Metals Nat'l Bank of City of N.Y.*, 201 F. 664 (2d Cir. 1912), *aff'd sub nom.*, *Nat'l City Bank of N.Y. v. Hotchkiss*, 231 U.S. 50 (1913).

Instead, Mr. Errato has admitted, that, at all times relevant to the events described in the Amended Complaint—i.e., from September 2014 through 2016—he and his accounts were subject to the terms of a Cardmember Agreement. *See* Am. Compl. ¶¶ 9–13. Similarly, Mr. Errato asserts that while he has received monthly correspondence from American Express for 30

years or more, he has "no recollection" of receiving any amendment to that Cardmember Agreement.

The only relevant issue thus is whether Mr. Errato actually received these amendments. But again, Mr. Errato has not actually denied receipt. Nor has he made any evidentiary showing that he did not receive them, or refuted any of the specific evidence put forward by American Express that he was, in fact, mailed the various amendments to his Cardmember Agreements.

In light of of the four amendments to the Cardmember Agreement submitted by American Express, and Mr. Errato's failure to deny receiving them, American Express has met its burden in demonstrating that these amendments were sent to Mr. Errato, and that he received them.

Accordingly, the Court may determine whether Mr. Errato assented to these amendments—and thus, whether the arbitration provisions are valid—as a matter of law. *Adams v. Suozzi*, 433 F.3d 220, 228 (2d Cir. 2010) ("Although the FAA provides that '[i]f the making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof,' no trial is required where the court can rule upon the existence of the arbitration agreement 'as a matter of law on the record before it[.]'") (quoting 9 U.S.C. § 4; *Specht*, 306 F.3d at 28).

### 4. Acts as Acceptance

Under both Connecticut and Utah law, acts may constitute acceptance of contracts. *See Schwarzchild v. Martin,* 191 Conn. 316, 321–322 (1983) ("In the absence of a statute requiring a signature . . . parties may become bound by the terms of a contract, even though they do not sign it, where their assent is otherwise indicated, such as by acceptance of benefits under the contract."); *Comm. Union Assocs. v. Clayton*, 863 P.2d 29, 34 (Utah Ct. App. 1993) ("It is axiomatic that a party may become bound through its performance to a contract that it has not

signed. 'It is a fundamental contract law that the parties may become bound by the terms of a contract even though they did not sign the contract, where they have otherwise indicated their acceptance of the contract, or led the other party to so believe that they have accepted the contract.'") (quoting *Ercanbrack v. Crandall-Walker Motor Co.*, 550 P.2d 723, 725 (Utah 1976)).

Accordingly, both Connecticut and Utah courts have routinely recognized that the use of a credit card is sufficient to prove acceptance of a cardmember agreement. *See, e.g.*, *Am. Express Bank, FSB v. Zorba,* No. CV106001037, 2012 WL 3854645, at *2 (Conn. Super. Ct. Aug. 9, 2012) ("His acceptance and use of the benefits of the credit card constituted his acceptance of the terms set forth in the Business Card Credit Agreement.") (quoting *Schwarzchild,* 191 Conn. at 321–322); *MBNA Am. Bank, N.A. v. Goodman*, 140 P.3d 589, 592 (Utah Ct. App. 2006) ("Goodman was provided with a copy of the Agreement, the Agreement contained a provision that acceptance of the Agreement's terms occurred through use of the credit card, and Goodman undisputedly used the credit account. Therefore, MBNA's complaint should not have been dismissed even if the Agreement did not contain Goodman's signature.").

American Express argues that Mr. Errato, by using his credit cards after receiving the various amendments to his Cardmember Agreements, accepted their terms, including the arbitration provisions contained therein.

The Court agrees.

The 2010, 2011, and 2015 amendments indicate that the cardmember's use of the card, or decision to sign or keep the card, constitute acceptance of the Agreement. *See* Dec. 31, 2010 Amdt. at 3, "About your Cardmember Agreement"; Jun. 27, 2011 Amdt. at 3, "About your Cardmember Agreement," Jun. 30, 2015 Amdt. at 1, "About your Cardmember Agreement."

Mr. Errato has admitted that he was a cardholder of the 6005 and 5005 cards—i.e., the cards that were the subject of the 2010 and 2011 amendments, respectively—"at all times relevant hereto," meaning between 2014 and 2016. Am. Compl. ¶¶ 9–10. Mr. Errato thus did "sign or keep" the 6005 and 5005 cards.

In addition, American Express has submitted direct evidence that Mr. Errato used the card ending in 6003 after June 30, 2015—the date of the June 30, 2015 amendment. *See* Account Statement, dated Apr. 27, 2016, annexed as Ex. 4 to Hernandez Decl.

The Court therefore agrees with American Express that by signing and keeping the 6005 and 5005 cards, and by using the 6003 card, Mr. Errato accepted the 2010, 2011, and 2015 amendments and all of their terms, including the arbitration provisions.

Accordingly, Mr. Errato consented to the arbitration clauses in the amendments and they are valid.

### B.  Scope of the Arbitration Agreement

"In accordance with the strong federal policy in favor of arbitration, the existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it 'may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *WorldCrisa,* 129 F.3d at 74 (quoting *Assoc. Brick Mason Contractors of Greater N.Y., Inc. v. Harrington,* 820 F.2d 31, 35 (2d Cir. 1987)).

"When considering whether claims fall within the scope of an arbitration clause ... we analyze the factual allegations made" in Plaintiffs' Complaint. *Holick v. Cellular Sales of N.Y., LLC,* 802 F.2d 391, 395 (2d Cir. 2015) (citing *Smith/Enron Cogeneration Ltd. v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 99 (2d Cir. 1999)). "If the allegations underlying the

claims touch matters covered by the parties' ... agreements, then those claims must be arbitrated, whatever the legal labels attached to them." *Id.* (quoting *Smith/Enron,* 198 F.3d at 99).

Having determined that the 2010, 2011, and 2015 amendments to the terms of the Cardmember Agreements were valid, their terms should be interpreted in accordance with Utah principles of contract interpretation, as required by their choice-of-law clause. Under Utah law, courts

> first look at the plain language [of the contract] to determine the parties' meaning and intent. If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contact may be interpreted as a matter of law. But where a contractual term or provision is ambiguous as to what the parties intended, the question becomes a question of fact to be determined by the fact-finder. So where parties to a contract dispute propose competing interpretations of a contractual term or provision, we must determine whether the contract as a whole unambiguously supports one interpretation over the other. If uncertain meanings of terms, missing terms, or other facial deficiencies prevent the court from determining which of the proffered alternative interpretations the parties intended when they entered into the contract, then the court deems the contractual provision at issue ambiguous, and the ambiguity must be resolved by considering extrinsic evidence of the parties' intent.

*Brady v. Park*, 2019 UT 16, ¶ 10 (internal quotation marks and footnotes collecting cases omitted).

Mr. Errato argues, however, that American Express "has not presented any evidence of an agreement to arbitrate for cards ending in the numbers 6003, 7001, 7003, or 8001," and that "[i]t would be impossible to arbitrate this dispute for only two (2) of the five (5) charge cards, as that would bifurcate the dispute between this court and Arbitration[.]" Pl.'s Arb. Mem. at 4.

The Court disagrees.

First, American Express has presented evidence suggesting that Mr. Errato is conflating changes in card numbers with changes in accounts. Arb. Mot. Reply at 2. Meanwhile, Mr. Errato, has not presented any specific evidence to refute American Express's claim that he only had two accounts and that the changes in card numbers did not affect the nature of the underlying credit accounts.

Second, even if Mr. Errato was correct that the 2010, 2011, and 2015 amendments, as a whole, do not govern all of his accounts with American Express, the scope of the arbitration provisions in those amendments is sufficiently broad to cover all of the claims in this action.

The 2010 and 2011 amendments to the Cardmember Agreements state that "if either party elects to resolve a claim by arbitration, that claim shall be arbitrated on an individual basis." By using the word "shall," all of these agreements make arbitration, if chosen by American Express or Mr. Errato, mandatory.

Both the 2010 and 2011 amendments to the Cardmember Agreements define "claim" as "any claim, dispute or controversy between [Mr. Errato and American Express] arising from or relating to your Account, this Agreement, the Electronic Funds Transfer Services Agreement, and any other related or prior agreement that you may have had with us, or the relationships resulting from any of the above agreements, except for the validity, enforceability or scope of this Arbitration provision."

Under this language, any claim, dispute, or controversy that "related to" Mr. Errato's account, or to a relationship that "resulted from" the 2010 and 2011 amendments, is subject to the arbitration clauses in those agreements—absent proof that a later act or amendment substantively modified the underlying right of either party to elect mandatory arbitration. Mr. Errato has offered no such proof.

This language thus would require arbitration of all of Mr. Errato's claims against American Express in this action—all of which concern disputes about charges on his accounts between 2014 and 2016—regardless of whether his accounts were subsequently assigned new card numbers, because any later-issued cards linked to the original accounts plainly "relate to" the accounts or, in the alternative, "resulted from" the accounts, and therefore from the terms that governed those accounts: the 2010 and 2011 amendments.

Similarly, the 2015 amendment to the Cardmember Agreement states that "[i]f arbitration is chosen by any party, neither you nor we will have the right to litigate that claim in court or have a jury trial on that claim, and that "[i]f either party elects to resolve a claim by arbitration, that claim will be arbitrated on an individual basis." *Id.* at 5, 6. By using the word "will," this agreement makes arbitration mandatory, if elected by either Mr. Errato or American Express.

This amendment defines "claim" as "any current or future claim, dispute or controversy relating to your Account(s), this Agreement, or any agreement or relationship you have or had with us, except for the validity, enforceability or scope fo the Arbitration provision." *Id.* at 5.

This language thus would require arbitration of all of Mr. Errato's claims against American Express in this action—all of which concern disputes about charges on his accounts between 2014 and 2016—as the language sweeps in past accounts, agreements, or relationships that precede the amendment as well as future claims relating to the accounts as of June 30, 2015.

The language of the 2010, 2011, and 2015 amendments therefore is unambiguous, and plainly broad enough to encompass all of Mr. Errato's claims against American Express in this action.

Accordingly, Mr. Errato must arbitrate his claims against American Express.

### C. Stay of Proceedings

The Second Circuit has clarified that a stay of all proceedings is mandatory "after all claims have been referred to arbitration and a stay requested." *Katz v. Cellco P'ship.*, 794 F.3d 341, 345 (2d Cir. 2015) ("The FAA's text, structure, and underlying policy command this result . . . . The plain language specifies that the court "shall" stay proceedings pending arbitration, provided an application is made and certain conditions are met . . . . Nowhere does the FAA abrogate this directive or render it discretionary."). But "if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987).

"The decision to stay the balance of the proceedings pending arbitration is a matter largely within the district court's discretion to control its docket." *Genesco*, 815 F.2d at 856 (citation omitted); *see also Katsoris v. WME IMG, LLC*, 237 F. Supp. 3d 92, 110–11 (S.D.N.Y. 2017) (noting that "*Katz* did not explicitly address whether the FAA requires a district court to stay all proceedings where, as here, fewer than all claims have been referred to arbitration," collecting cases indicating that decision to stay balance of proceedings remains within the district court's discretion, and concluding that "whether or not the FAA requires a stay where some but not all claims are referable to arbitration, a district court may stay proceedings in its discretion.").

Though American Express does not seek to require LinkedIn, Google, or Mr. Whitaker to arbitrate their claims, LinkedIn urges the Court to proceed with the claims against it and decide its motion to dismiss now before staying the remainder of the proceedings. *See* LinkedIn Arb. Resp. at 1. LinkedIn argues that requiring it to wait for Mr. Errato's arbitration with American

Express to conclude, and thus keeping LinkedIn in this case, would be "highly prejudicial" when dismissal may be warranted.[7]

The Court disagrees.

First, the Court fails to see any genuine prejudice to LinkedIn here. LinkedIn will simply remain in this case, but will not be required to take any action until the arbitration has concluded. A stay therefore should not prejudice LinkedIn.

Second, "[a] discretionary stay is particularly appropriate where there is significant factual overlap between the remaining claims and the arbitrated claims." *Winter Inv'rs v. Panzer*, No. 14 Civ. 6852 (KPF), 2015 WL 5052563, at *11 (S.D.N.Y. Aug. 27, 2015) (collecting cases). All the claims in this action are interrelated because American Express is alleged to have taken certain steps in response to LinkedIn and Google. "In such cases, a stay is warranted in part because the prior litigation or arbitration is likely to have preclusive effect over some or all of the claims not subject to arbitration." *Id.* at *11 (citing *Bear, Stearns & Co. v. 1109580 Ont., Inc.*, 409 F.3d 87, 91 (2d Cir. 2005)).

For both of these reasons, the Court declines to take up LinkedIn's motion to dismiss at this juncture, and will instead stay all proceedings pending resolution of the arbitration between Mr. Errato and American Express.

IV.     **CONCLUSION**

For the reasons explained above, American Express's motion to compel arbitration, and to stay all proceedings pending arbitration, is **GRANTED**.

---

[7] At oral argument, Google suggested the Court should proceed to hear and decide its own motion to dismiss without regard to the stay. For the same reasons articulated with respect to LinkedIn, however, the Court declines to rule on Google's motion to dismiss at this time.

The Court **ORDERS** Mr. Errato and American Express to arbitrate their claims under 9 U.S.C. § 4. These proceedings are hereby **STAYED** under 9 U.S.C. § 3.

All remaining pending motions to dismiss the Amended Complaint are **DENIED** at this time in light of the stay of these proceedings, without prejudice to renewal after the arbitration has concluded.

The Clerk of the Court is respectfully directed to close this case administratively due to the stay of these proceedings.

If the parties require additional relief from this Court following the arbitration, they may move to re-open this case.

**SO ORDERED** at Bridgeport, Connecticut, this 23rd day of August, 2019.

/s/ Victor A. Bolden
Victor A. Bolden
United States District Judge